UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOLENE FURDEK and JONATHAN RYAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation, and APPLE INC., a California corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ....... 1

II. JURISDICTION AND VENUE ....... 7

III. PARTIES ....... 8

IV. RELEVANT FACTS ....... 9

A. Apple's Dual Distribution Scheme – A Strategy of Scarcity ....... 9

B. Amazon's Dual Roles – A Marketplace Operator and a Retailer ....... 11

C. Apple and Amazon Compete With Each Other and Third-Party Merchants. ....... 14

D. There Was Active Marketplace Competition in the Sale of Apple Products Before the Unlawful Boycott Agreement. ....... 15

E. By Agreement, Amazon and Apple Excluded Nearly All Third-Party Merchants that Sell Apple Products on Amazon's Platform and Eliminated the Competitive Threat They Posed. ....... 17

F. The Unlawful Boycott Agreement Has Had Substantial Anticompetitive Effects. ....... 19

1. The Unlawful Boycott Agreement had anticompetitive effects on the merchant side of the market. ....... 19

2. The Unlawful Boycott Agreement had anticompetitive effects on the consumer side of the market. ....... 20

3. The Unlawful Boycott Agreement reduced output. ....... 23

G. Both Amazon and Apple Secured Anticompetitive Benefits from the Unlawful Boycott Agreement. ....... 24

H. There is No Procompetitive Justification for the Unlawful Boycott Agreement, Much Less One Unattainable Through Less Restrictive Means. ....... 25

V. RELEVANT MARKETS ....... 26

A. Within the Online Marketplaces Market, There is a Relevant Antitrust Submarket for Tablet Transactions. ....... 26




HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1. Transactions on Non-Platform Online Stores Are Not Reasonable Substitutes....28

2. Brick-and-Mortar Stores Are Not Reasonable Substitutes....33

3. The Proposed Market Would Pass a SSNIP Test....34

B. The Relevant Geographic Market is the U.S.....37

C. Amazon Has Substantial Market Power in the Market for U.S. Online Marketplaces, including the Submarket for Tablet Transactions.....37

D. In the Alternative, There Is a Relevant One-Sided Antitrust Submarket for The Sale of Tablets on Online Marketplaces, and Amazon Has Market Power in That Submarket.....41

VI. INTERSTATE TRADE AND COMMERCE....44

VII. CLASS ALLEGATIONS....44

VIII. ANTITRUST INJURY AND STANDING....47

IX. CLAIM FOR RELIEF....48

VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE – CONCERTED REFUSAL TO DEAL / GROUP BOYCOTT....48

PRAYER FOR RELIEF....51

JURY TRIAL DEMANDED....51




HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiffs Jolene Furdek and Jonathan Ryan allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys and experts in the field of antitrust economics:

## I. INTRODUCTION

1. Amazon operates the digital platform, Amazon Marketplace. Amazon Marketplace is the world's largest online marketplace, where Amazon sells millions of goods as a retailer and also hosts millions of third-party merchants. Amazon is the largest online seller of electronics, with 82% of the market.[1] In addition to hosting other third-party sellers, Amazon also sells Apple products (and other consumer electronics) on its own marketplace in its capacity as a retailer. Apple is the world's largest technology company, specializing in the manufacture and sale of consumer electronics. Apple sells its products directly to consumers on its own online store and indirectly through third-party distributors, including Amazon. Direct sales to consumers is an important part of Apple's business; Apple is the third largest online retailer in the United States.[2]

2. In their capacities as online electronics retailers, Amazon and Apple are horizontal competitors who compete for sales to consumers of Apple's own products and the sale of consumer electronics generally. But the competition is not symmetrical. As an online marketplace offering an array of goods, from an array of sellers, Amazon offers consumers a one-stop shopping experience that Apple cannot reproduce. So advantaged, Amazon's pricing of Apple products constrains Apple's direct-to-consumer sales more than Apple's prices constrain Amazon's. Yet, in the end, both Amazon and Apple have an economic incentive to sell as many Apple products as possible. Amazon makes enormous profits on its first-party sales of Apple's products, particularly when it receives sufficient inventory from Apple on favorable terms and

---

[1] 2019 Jumpshot report, Losers Brands and Retailers Who Couldn't Make It Happen in 2018 at 21.

[2] *Market share of leading retail e-commerce companies in the United States in 2025,* Statista (April 22, 2026), https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/ (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

eliminates the competition (which occurred as a result of the collusive restraint at issue here). And Apple's own profit margins are higher when it sells directly to consumers.

3. Amazon and Apple compete not only against each other for the sale of Apple products, but also against the third-party merchants that sell consumer electronics, including Apple products, on Amazon Marketplace. Whenever a third-party merchant sells an iPad on the Amazon Marketplace, that is an iPad sale that neither Amazon (as a retailer) nor Apple (as a direct seller) will make. Vigorous competition from the third-party merchants exerts downward pressure on the online prices that Amazon as a first-party seller or Apple on its online store can charge for Apple products.

4. This case concerns an unlawful horizontal agreement between Apple and Amazon to eliminate or at least substantially reduce the competitive threat posed by third-party merchants. The agreement is unlawful under the Sherman Act.

5. Historically, there were never limits on the number of Apple resellers operating on Amazon's marketplace.[3] Amazon was one of those resellers, but there were hundreds of others. The ranks grew substantially in 2017, prompting active price competition. By the outset of 2018, at least 600 third-party Apple resellers were active on the platform. And prices were falling as a result, with third-party merchants offering steep discounts—sometimes exceeding 20 percent—off the prices Apple charged on its own online store.

6. This posed a problem for both Apple and Amazon. Apple has a history of maintaining high market prices for its products by withholding supplies from resellers that would otherwise undercut Apple's own retail prices.[4] Active price competition on Amazon Marketplace threatened to destabilize the high prices Apple seeks to sustain in its own stores. This was also a problem for Amazon. Displeased with active price competition on Amazon Marketplace, Apple refused to authorize Amazon to sell Apple's most popular products. This forced Amazon to

[3] This Complaint refers to sellers of Apple products on Amazon's platform as "third-party merchants" when describing them from the perspective of Amazon Marketplace and as "Apple resellers," when describing them from the perspective of Apple's distribution chain.

[4] *See infra*, Section IV.A.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

purchase Apple products from other sources and raised its acquisition costs.[5] As a retailer, Amazon's own share of the sale of Apple products on Amazon Marketplace was virtually non-existent.

7. Unable to overcome these challenges unilaterally, the two online giants—Apple and Amazon—decided in 2018 to address them collectively. They did so through a horizontal agreement that eliminated nearly all Apple resellers on Amazon Marketplace—their horizontal competitors. In exchange for eliminating the Apple resellers that were driving down online prices for Apple products, Apple agreed to provide Amazon consistent supplies at a discount of up to 10%—contingent on its ability to keep the excluded sellers off Amazon Marketplace.[6] This was accomplished by the Global Tenets Agreement, dated October 31, 2018, and made effective January 1, 2019 (hereinafter the "Unlawful Boycott Agreement").[7] The Unlawful Boycott Agreement authorized Apple to place a quantitative limit on the number of Apple resellers operating on Amazon Marketplace, and as consideration for Amazon's consequent exclusion from its marketplace of hundreds of third-party merchants that sell Apple goods, Apple guaranteed a steady supply of Apple goods to Amazon (in its capacity as a retailer) at discounted wholesale prices. Pursuant to the Unlawful Boycott Agreement, Apple authorized just seven Apple resellers to sell on Amazon Marketplace in the United States. The remaining resellers (at least 600) had their Apple products removed from the platform by Amazon. This was an acute demonstration of Amazon's immense market power to pull multiple levers to benefit itself and a coconspirator—i.e., it could both preclude access to the Amazon Marketplace to third-party merchants as the controller of the platform and also use its power as a seller to quickly become dominant in any product offering as long as it received favorable access to the goods to be sold. Amazon's exercise of that power to pull these multiple levers, in concert with Apple's

---

[5] Autorita' Garante della Concorrenza e del Mercato (AGCM) Nov. 16, 2021 decision, ¶ 76 ("AGCM Decision"), available at https://www.agcm.it/dotcmsdoc/allegati-news/I842%20chiusura.pdf (last visited Sept. 28, 2026).

[6] *Id.* ¶¶ 76, 195, 197.

[7] AGCM Decision ¶¶ 58, 68.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

participation on its side of the Unlawful Boycott Agreement, led to severe anticompetitive effects.

8. The Unlawful Boycott Agreement transformed Amazon's near-zero share of Apple iPad sales on Amazon Marketplace to its current dominant position, as depicted in the below chart, which identifies the percentage of days in a month in which Amazon won the buy box for sales of new Apple iPads, both before and after the Unlawful Boycott Agreement:[8]




9. But the win for Amazon was a loss to consumers. Competitive pricing pressure was removed almost immediately, and Amazon raked in enormous profits on its sale of Apple goods. As economic analysis shows, consumers paid more for iPads on Amazon than they would have in a competitive market. Specifically, the effect of the Unlawful Boycott Agreement can be seen by comparing the Amazon prices of iPads and Samsung Galaxy tablets. Samsung tablets are iPads' closest competitor on Amazon and sold in large volume by both Amazon and third-party

[8] As discussed in Section IV.B, Amazon Marketplace employs an algorithm to select the offer to occupy the "buy box," or one-click purchase offer that 90% of consumers rely on when they buy on Amazon Marketplace. Thus, competition for the buy box is the primary way that merchants, including Amazon, compete with each other on Amazon Marketplace.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

sellers. But, unlike iPads, Samsung tablets were never subject to the Unlawful Boycott Agreement. This makes them a natural benchmark: if market forces, rather than the Unlawful Boycott Agreement, were responsible for the price consumers paid for iPads, Samsung tablet prices would be expected to follow a similar trajectory. They did not.

10. Before the Unlawful Boycott Agreement, Samsung tablet prices on Amazon averaged $274 less than iPad prices. After the agreement took effect, iPad prices spiked (and remained elevated) while Samsung prices did not. This gap widened to $563, an increase of $289, as shown below[9]:




11. As discussed below, controlling for product characteristics, the estimated overcharge attributable to the Unlawful Boycott Agreement is approximately $40 to $109 per iPad. Single damages to Plaintiffs and the proposed Class are substantial.

12. The merchants removed from the platform were likewise harmed. Amazon operates as the gatekeeper to the online retail market.[10] For many third-party merchants, Amazon

[9] The figures and analysis here, as well as the figure above, are based on publicly available data from Keepa, a service that tracks historical pricing, seller, and product data for items listed on Amazon.

[10] Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, 116th Cong., Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report") at 256 (2020), https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Marketplace is the only viable channel for reaching consumers.[11] Excluded from the platform by virtue of the Unlawful Boycott Agreement, many merchants had nowhere to turn and could not and cannot compete in the market. As one congressional body has concluded, online merchants "who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon."[12]

13. At the expense of consumers, merchants, and competition as a whole, Amazon and Apple—who are horizontal (albeit asymmetrical) competitors—profited handsomely from the Unlawful Boycott Agreement. With limited residual competition from third-party merchants that sell Apple products on Amazon's platform, Amazon transformed its position on Amazon Marketplace from a peripheral seller of Apple iPads to the platform's dominant seller, charging higher prices than consumers had previously enjoyed before the Unlawful Boycott Agreement, even while Amazon enjoyed a steady, discounted supply of Apple products. In short, Amazon reaped tremendous benefits (profits) from the Unlawful Boycott Agreement. For Apple, the higher prices on Amazon's platform meant that fewer of its customers defected to Amazon Marketplace, which stabilized the prices Apple could sustain on its own distribution channel. In purpose and effect, Amazon and Apple cut out the third-party merchants and divided the spoils at inflated prices to consumers.

14. This case is thus not about Apple independently selecting its trading partners or Amazon independently enforcing its own platform rules. It is about two horizontal competitors agreeing to eliminate the competitive threat posed by hundreds of other horizontal competitors. Erecting barriers to entry to keep competitors out and raising prices in the wake of their elimination is precisely the kind of conduct that Congress enacted antitrust laws to prevent and cannot be justified on procompetitive grounds. This collusive agreement is what economists call a "group boycott" or "concerted refusal to deal." These arrangements have long been deemed unlawful under the Sherman Act. The litigated question typically involves whether the boycott

[11] *See* AGCM Decision, ¶¶ 131-32 (finding that in Italy the Boycott agreement reduced online sales of some former third-party sellers by as much as 95%).

[12] House Report at 258.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

agreement was in fact struck, or at least inferable from the circumstances. Here, there is no mystery. Amazon admitted to Congress that it entered an agreement with Apple that permits only "seven resellers of new Apple products" on its platform.[13]

15. The Unlawful Boycott Agreement can likewise not survive scrutiny under the "rule of reason," were that standard applied. As set forth in this Complaint, there is an Online Marketplaces Market, with a relevant submarket for Tablet Transactions. Amazon dominates this market with an 82% share of the online retail electronics market and as much as 90% of online retail marketplace sales.[14] The Unlawful Boycott Agreement caused severe anticompetitive effects in these relevant submarkets, and it cannot be justified as serving any procompetitive end.

16. The Unlawful Boycott Agreement is unlawful under any applicable standard. It should be enjoined and Plaintiffs, and the class Plaintiffs seek to represent, should be awarded damages and all other relief needed to make them whole.

## II. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 15(a) and § 26 because Plaintiffs allege violations of federal law, namely, the Sherman Act and Clayton Antitrust Act.

18. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

---

[13] *See* Amazon Responses to Questions for the Record following the July 16, 2019 Hearing of the Subcommittee on Antitrust, Commercial, and Administrative Law, Committee on the Judiciary, Entitled "Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship" (October 11, 2019) ("Amazon's Congressional Responses"), at Response to Question 94, https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf (last visited Sept. 28, 2026).

[14] *See infra*, Sections V.A-C (describing relevant markets and Amazon's immense power in those markets); *see also* 2019 Jumpshot report; *Amazon Marketplace is 25% of US E-commerce*, Marketplace Pulse (Feb. 1, 2022), https://www.marketplacepulse.com/articles/amazon-marketplace-is-25-of-us-e-commerce (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

19. This Court has personal jurisdiction over the Defendant Amazon, which is headquartered in this District, does business in Washington, directly or through agents, and has registered with the Washington Secretary of State, such that it has sufficient minimum contacts with Washington.

20. This Court has personal jurisdiction over both Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants have each acted within one or more judicial districts of the United States and because they have sufficiently caused foreseeable consequences in this country. Through its substantial business operations in this District, this State, and throughout the country, Amazon has engaged in sufficient minimum contacts with the forum, and it has intentionally availed itself of the laws of the United States. This Court has personal jurisdiction over the Defendant Apple because Apple has engaged in substantial business operations throughout the United States. Apple is incorporated in California and headquartered in Cupertino, California, and it sells its products directly to its retail customers throughout the United States through physical stores in nearly every state and through its online store as well as indirectly through hundreds of Apple resellers.[15]

21. This judicial district is a proper venue pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Amazon resides in this District and transacts affairs in this District. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## III. PARTIES

22. Plaintiff Jolene Furdek is a resident of Plano, Texas.

23. On July 1, 2020, Ms. Furdek purchased a new Apple iPad from the buy box on Amazon Marketplace for $399.99. Amazon was the seller of record. As a result of the Unlawful Boycott Agreement, Ms. Furdek was denied purchasing on Amazon Marketplace at a lower price which would have been the case in a normal competitive market.

24. Plaintiff Jonathan Ryan is a resident of Spokane, Washington.

[15] *See* https://www.apple.com/retail/storelist/ (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

25. On February 5, 2021, Mr. Ryan purchased a new Apple iPad Air from the buy box on Amazon Marketplace for $549.98. Amazon was the seller of record. On November 10, 2022, Mr. Ryan purchased a new Apple iPad Mini from the buy box on Amazon Marketplace for $399.99. Amazon was the seller of record. As a result of the Unlawful Boycott Agreement, Mr. Ryan was denied purchasing on Amazon Marketplace at a lower price which would have been the case in a normal competitive market.

26. Defendant Amazon is a corporation organized and existing under the laws of Delaware, with its principal place of business in Seattle, Washington. Amazon is the world's largest online retailer and operates the world's largest online retail marketplace.

27. Defendant Apple designs, manufactures, and sells iPhones and iPads, as well as other personal computers and smart watches, and it sells a variety of related peripheral products and services, which it sells throughout the United States. Apple maintains its headquarters and principal place of business in Cupertino, California.

## IV. RELEVANT FACTS

### A. Apple's Dual Distribution Scheme – A Strategy of Scarcity

28. Apple distributes its products through two channels. First, Apple maintains its own retail stores, including an online store and physical outlets. This is Apple's direct distribution channel. Second, Apple distributes its products through a network of third-party distributors and resellers. To become an official Apple reseller (hereafter "Authorized Reseller"), retailers must enter into an Authorized Reseller Agreement with Apple. Authorized Resellers are offered discounts and rebates in exchange for their adherence to certain Apple terms and conditions governing the resale of Apple products.[16] Apple reportedly has Authorized Reseller Agreements with Best Buy, Target, Staples, AT&T, and others.[17]

[16] *See* AGCM Decision at ¶ 26. The AGCM Decision was annulled on procedural grounds, without any criticism of the agency's factual or economic findings. The AGCM's decision references and describes many primary source materials—including internal Apple and Amazon documents—and, where appropriate, this Complaint refers to the decision for that purpose.

[17] *See* https://appleinsider.com/deals/apple-authorized-resellers (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

29. Other Apple resellers purchase their supplies from wholesalers or other intermediaries in the chain of distribution. Unauthorized Apple resellers are not proscribed or illicit. While these resellers do not receive the discounts and rebates afforded Authorized Retailers, they are generally permitted to distribute Apple products through any retail channel available to them (putting aside the Unlawful Boycott Agreement at issue).

30. While Apple benefits from its network of third-party distributors and resellers, who provide greater exposure for Apple's products, Apple's own profit margins are higher when it sells directly to consumers. Apple is thus incentivized to try to maintain a roster of Apple resellers to increase its products' exposure and product reach while constraining these merchants' sales to prevent consumers from defecting from Apple's own stores. Apple has a track record of doing just this.

31. Most recently, in 2020 Apple was fined €1.1 billion by the French competition authority for artificially restricting the distribution of its products through its two French wholesalers, including by dictating (and limiting) downstream distribution to retailers and fixing the retail prices at which Apple products could be sold.[18] Upholding a reduced fine of €372 million, the Court of Appeals of Paris concluded (based on its review of internal correspondence and the investigatory file) that Apple has "adopted a strategy of scarcity" such that "while retailers received only limited quantities of constrained products from wholesalers, the Apple Store or Apple Online Store benefited from a large availability of these same products."[19] By restricting third-party supply, Apple prevented resellers from competing with Apple's own direct sales to consumers.[20]

32. As set forth below, this case involves another iteration of the same overarching strategy of scarcity. The difference here is that Apple achieved scarcity not with conditions

---

[18] *See* David McGabe, *France Fines Apple $1.2 Billion for Antitrust Issues*, N.Y. Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/technology/france-apple-antitrust-fine.html (last visited Sept. 28, 2026).

[19] Cour d'appel [CA] [regional court of appeal] Paris, 7, Oct. 6, 2022, 20/08582 ("Court of Appeals Paris Decision") ¶¶ 286, 294.

[20] *Id.* at 600.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

imposed on its wholesalers, but rather by entering a horizontal agreement with Amazon that outright eliminated virtually all other competitors from the world's largest marketplace.

**B. Amazon's Dual Roles – A Marketplace Operator and a Retailer**

33. Amazon runs the largest online retail marketplace and the most visited ecommerce website in the world.[21] The platform allows third-party merchants to list and sell products of all sorts, including consumer electronics. Millions of merchants list their goods on the platform,[22] and more than 200 million consumers shop on Amazon's marketplace every month.[23] At least 60 percent of all online product searches in the U.S. begin on Amazon.com.[24]

34. As a marketplace operator, Amazon charges third-party merchants listing fees (either a flat monthly fee of $39.99 or $0.99 per sale), as well as referral fees.[25] Amazon also sells merchants shipping and logistics services through its "Fulfillment by Amazon" ("FBA") program.[26] As a practical matter, paying for FBA "is functionally the only way for sellers to get a Prime badge for their product listings."[27] Prime eligibility is critical because there are more than 150 million enrollees in the Prime Program in the United States.[28]

35. Prime is a paid membership program under which enrollees receive free shipping on Prime products, and other platform benefits. A loss leader for Amazon,[29] Amazon uses Prime

---

[21] House Report at 255.

[22] House Report at 249.

[23] Jillian Hufford, *Amazon Statistics: Need To Know Numbers about Amazon* [Infographic], NCHANNEL Blog (Feb. 20, 2020), https://www.nchannel.com/blog/amazon-statistics/ (last visited Sept. 28, 2026).

[24] House Report at 256.

[25] *Selling Plans*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited Sept. 28, 2026).

[26] House Report at 287.

[27] House Report at 287.

[28] *See* Daniela Coppola, *Number of Amazon Prime users in the United States from 2017 to 2022 with a forecast for 2023 to 2024*, Statista (July 5, 2022), (https://www.statista.com/statistics/504687/number-of-amazon-prime-subscription-households-usa/ (last visited Sept. 28, 2026).

[29] Analysts estimate that free shipping for Prime users costs Amazon $1 billion every year. Nanette Byrnes, *How Amazon Loses on Prime and Still Wins*, MIT TECH. REV. (July 12, 2016), https://www.technologyreview.com/2016/07/12/158869/how-amazon-loses-on-prime-and-still-wins/ (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

to lock consumers into the platform. Having paid Prime enrollment fees out-of-pocket ($14.99 per month or $139 per year), consumers are incentivized to make further purchases on the platform to recoup this otherwise sunk cost. Research shows that Prime members are 96% more likely to buy from Amazon's marketplace than any other online retail site.[30]

36. In addition to operating the world's largest online marketplace, Amazon is itself the dominant retailer on that marketplace. That is, Amazon has its own inventory of products—both Amazon-branded products and products it procures from other vendors—and Amazon sells those products on its own platform. Amazon has reported that approximately 40% of all sales on its platform are sales of products for which Amazon (and not any third-party) is the merchant and retailer.[31] These two sales channels—third-party merchant and Amazon-retailed—can be depicted as follows:[32]

---

[30] Kiri Masters, *89% of Consumers Are More Likely to Buy Products from Amazon than Other E-Commerce Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/?sh=74a1287f4af1 (last visited Sept. 28, 2026).

[31] *See* Jeff Bezos Shareholder Letter (March 5, 2021) at 1, available at: https://www.aboutamazon.com/news/company-news/2020-letter-to-shareholders (last visited Sept. 28, 2026).

[32] Emily Sullivan, *Winning the Amazon Buy Box*, Tinuitu (Oct. 24, 2023), https://tinuiti.com/blog/amazon/win-amazon-buy-box/ (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**Types of Sellers on Amazon and Shipping Options**[1535]




37. Whether a consumer purchases a product offered by a third-party merchant or Amazon often depends on which seller is featured in the "buy box" for the product. Multiple sellers, including third parties and Amazon, can offer the same product on Amazon's marketplace. Thus, when there are a variety of sellers for particularly desirable products, including Amazon and third-party sellers, vigorous price competition often ensues. When a consumer selects a product on Amazon, a listing page for that product appears with a white box on the right-hand side containing "Buy Now" and "Add to Cart" buttons. That is the "buy box." While consumers have an option to peruse different sellers, only one seller appears in the buy box at any given point in time (although it can change throughout any given day), and that seller may be Amazon itself or a third party. When the consumer clicks "Buy Now" or "Add to Cart," the sale goes automatically to the seller in the buy box. Studies indicate that more than 90% of Amazon's sales go through the buy box.[33]

[33] *See* House Report at 249.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

38. Amazon has stated that the buy box winner is selected algorithmically, with relevant price, delivery speed and cost, Prime eligibility, and seller performance being considerations.[34] While third-party merchants may be aware of these factors, only Amazon knows exactly how the algorithm works and which seller will win the buy box for any given product.

**C. Apple and Amazon Compete With Each Other and Third-Party Merchants.**

39. As the foregoing illustrates, Apple and Amazon are horizontal competitors, albeit asymmetrical, and they compete with other online retailers of consumer electronics. The competition occurs at several levels.

40. At the highest level, both Apple and Amazon manufacture and retail consumer electronic devices, including devices in the same product categories. Amazon launched its Fire Tablet to compete with the iPad, a Fire Phone to compete with the iPhone, and Echo Buds to compete with AirPods. Apple products are sold not only by Apple and Amazon, but also by third-party merchants listing on Amazon Marketplace. Apple, Amazon, and the third parties all compete to win sales in these consumer electronic product categories (and others).

41. There is both inter- and intra-brand competition. That is, as a manufacturer, Apple wants consumers to buy iPads instead of Amazon's Fire Tablets, no matter which retailer sells them those devices. But as a retailer, it also wants to sell more iPads than competing retailers of Apple products because, as noted, its profits are higher on sales it facilitates through its own stores.

42. With respect to intra-brand competition, competition occurs both on Amazon Marketplace and across a broader ecommerce landscape. Amazon competes as a retailer with third-party merchants selling Apple products on Amazon Marketplace. Marketplace retailers (Amazon and third parties) also provide competition to Apple and the retail website it operates. An iPad purchased on Apple's website is an iPad not purchased from an Amazon retailer. And vice versa.

[34] *See* House Report at 250.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

43. In this fashion, Apple resellers on Amazon Marketplace constrain Apple's pricing. Low prices on the platform (either by Amazon itself or third-party merchants) exert downward pressure on the prices Apple can sustain on its own online storefront and draw sales volume away from Apple's more profitable direct retail channel and toward its less-profitable wholesale channels. Conversely, higher platform prices relieve this competitive pressure. Moreover, as explained in more detail *infra* at Section V.A.1, Amazon as a retailer competes with Apple and other third-party retailers of Apple products on the Amazon Marketplace, although as a platform offering an array of products, from an array of sellers, Amazon is less constrained by Apple, than vice versa. *See infra* Section V.A.1.[35] In other words, competition between two-sided transaction platforms, like Amazon Marketplace, with single-merchant online stores, like Apple's, is asymmetrical. *See id.* This asymmetry benefited Amazon, as it reaped in massive profits by raising prices on Apple goods after the Unlawful Boycott Agreement. Online transaction platforms, like Amazon Marketplace, which Plaintiffs term "Online Marketplaces," impose substantial price constraints on single-merchant online stores, given the relative ease of purchasing goods from a marketplace instead of a single-merchant store. But substitution in the other direction—from marketplaces to single-merchant stores—is more limited. The result is that price increases for Apple goods on the Amazon Marketplace are not disciplined by consumers switching to purchases on the Apple Store. *See infra* Sections V.A.1, 3 (for more detailed discussion).

**D. There Was Active Marketplace Competition in the Sale of Apple Products Before the Unlawful Boycott Agreement.**

44. Amazon has been a reseller of Apple products since at least 2012.[36] Before the Unlawful Boycott Agreement, Amazon Marketplace featured many active Apple resellers, with whom Amazon competed. Data indicate that, just prior to the agreement, there were more than

[35] In addition, while Amazon competes with Apple in its capacity as a retailer of Apple products, the Amazon *marketplace itself* is not a retailer but rather a two-sided platform mediating transactions between retailers and sellers. As set forth below, two-sided online transaction platforms ("Online Marketplaces") constitute a separate relevant antitrust market. *See infra*, Section V.A.

[36] AGCM Decision at ¶ 152.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

600 third-party merchants offering Apple products on Amazon's platform. This included Apple's Authorized Resellers, as well as other retailers lawfully selling Apple inventory. Neither Apple nor Amazon sought to preclude anyone from selling Apple products on Amazon Marketplace, provided they complied with all applicable Amazon listing requirements.

45. The large number of resellers sparked active price competition. Amazon and its third-party sellers know that price is a key determinant in winning the buy box for any given product listing and generating platform sales. More Apple resellers on the platform equals more price competition on the platform in the sale of Apple products.[37]

46. Because it faced stiff competition from third-party merchants in the sale of Apple products and was unable to secure a consistent supply of Apple products for its own retail sales, Amazon was only a peripheral seller of Apple products on Amazon Marketplace (representing less than one percent) before entering into the Unlawful Boycott Agreement.[38] Most sales went to third-party merchants who were actively competing with Amazon on the marketplace. Before the Unlawful Boycott Agreement, it was exceedingly rare that Amazon won the buy box (and thus the majority of sales for that product at that point in the day), and when it did, it sold Apple products at prices that were driven down by active third-party price competition.

47. To protect against counterfeiting, Amazon Marketplace already featured robust protections before the Unlawful Boycott Agreement. Amazon's 2012 distribution agreement with Apple contained numerous anti-counterfeiting clauses designed "to ensure that no non-genuine Apple products were sold on its marketplace."[39] In 2017, Amazon augmented this with its "Brand Registry Program," under which brand owners are given a range of tools, free of charge, to guard against counterfeiting. Over 500,000 brands have enrolled in the program, and they report "on average 99% fewer suspected infringements than before the launch [of the

[37] *What Amazon FBA Sellers Need to Know About Excessive Competition and Price Wars?*, WebsiteClosers.com (April 22, 2020), https://www.websiteclosers.com/resources/what-amazon-fba-sellers-need-to-know-about-excessive-competition-and-price-wars (recognizing that a high number of sellers on Amazon Marketplace will trigger price wars) (last visited Sept. 28, 2026).

[38] *See supra*, Section I.

[39] *See* AGCM Decision at ¶ 152.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

program].”[40] Amazon has invested in other programs as well, spending millions of dollars every year insulating its platform from counterfeiters. It now offers a product serialization service called “Transparency” (launched the same year as the Unlawful Boycott Agreement) that it claims “effectively eliminates counterfeits on enrolled products.”[41]

48. In sum, prior to the Unlawful Boycott Agreement, Amazon had already taken effective steps to minimize counterfeiting, and Amazon Marketplace was a highly competitive marketplace, featuring numerous active third-party merchants offering genuine Apple products at prices steeply discounted from the prices Apple wanted to sustain on its online storefront. And most of the marketplace sales of Apple products were going to third-party merchants (rather than to Amazon itself). This all benefited consumers in the form of lower prices and differentiated offerings of genuine Apple products. But for Apple and Amazon, it was a threat to the bottom line.

### E. By Agreement, Amazon and Apple Excluded Nearly All Third-Party Merchants that Sell Apple Products on Amazon’s Platform and Eliminated the Competitive Threat They Posed.

49. In 2017, Apple and Amazon began to negotiate the renewal of their existing Reseller agreement. From the outset of these discussions, the parties discussed “gating” third-party merchants that sold Apple products.[42] According to the Italian Competition Authority (“AGCM”), which reviewed the relevant Apple and Amazon correspondence, the limitations discussed on third-party merchants were not driven by qualitative considerations, e.g., the failure to provide genuine Apple products, but rather were “purely quantitative.”[43] That is, it did not matter which resellers were on the platform or how they performed, just that, from Defendants’ point of view, there were too many of them. The purpose and effect, of course, was to limit price competition. Ultimately Apple proposed, and Amazon agreed, to limit the number of resellers in

---

[40] *See* AGCM Decision at ¶ 121.

[41] *See* Amazon’s Congressional Responses, at Response to Question 91.

[42] *See* AGCM Decision at ¶ 61.

[43] *See* AGCM Decision at ¶ 64.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

each country to no more than 20.[44] This arbitrary and purely quantitative threshold excluded even Authorized Resellers of Apple products.[45]

50. On October 31, 2018, Apple and Amazon executed the Unlawful Boycott Agreement. It was global in scope, granting Apple the ability to specify for each geographic location the number of Apple resellers permitted to sell new Apple products on Amazon's marketplace.

51. Amazon has reported that, as of August 2019, only "seven resellers of new Apple products" were authorized under the Unlawful Boycott Agreement in the United States.[46] As noted, previously more than 600 Apple resellers were operating on the Amazon Marketplace. The Unlawful Boycott Agreement eliminated more than 98 percent of them (593 of at least 600). The elimination of resellers was particularly severe with respect to iPads, one of Apple's flagship products. Available data indicate that there were at least 500 resellers of iPads on Amazon's platform before the Unlawful Boycott Agreement, and after, no more than seven remained.

52. The boycott went into effect on January 1, 2019.[47] Prior to that, Amazon representatives discussed internally how the terms should be communicated. The official guidance was delivered in an anodyne FAQ script and a cautionary note: "Please try to limit written communication on this topic. If needed, you must limit strictly to what has been officially communicated today and to the Legal-Approved FAQs attached."[48] Excluded sellers, including Authorized Resellers of Apple Products, pushed back, but to no avail. No later than January 5, 2019, their Apple product offers were removed from the platform by Amazon.[49]

53. While the Unlawful Boycott Agreement eliminated virtually all other Apple resellers on Amazon Marketplace, it assured Amazon itself (as a retailer) steady access to Apple

---

[44] *See id.*

[45] *See* AGCM Decision at ¶¶ 74, 357.

[46] *See* Amazon Congressional Responses, at Response to Question 94.

[47] *See* AGCM Decision at ¶ 71.

[48] *See* AGCM Decision n.151.

[49] *See id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

products and a clear lane to distribute them free of nearly all platform competitors. In exchange for its agreement to bar nearly all third-party merchants that sold Apple products, Amazon was also granted (by Apple) wholesale discounts on Apple products, potentially reaching above 10%.[50]

54. The agreement thus effectively inverted the competitive conditions on Amazon's platform. Whereas third-party merchants previously dominated sales of iPads on Amazon Marketplace, the agreement eliminated this competitive threat and reallocated those marketplace sales to Amazon.[51] As discussed below, iPad prices on Amazon rose relative to comparable products, Samsung tablets, sold under competitive conditions, a result that benefitted Apple by stabilizing the prices it could charge on its own online store.

## F. The Unlawful Boycott Agreement Has Had Substantial Anticompetitive Effects.

55. By reducing and suppressing third-party competition, the Unlawful Boycott Agreement harmed both consumers and merchants and caused substantial anticompetitive effects in the market.

### 1. The Unlawful Boycott Agreement had anticompetitive effects on the merchant side of the market.

56. The Unlawful Boycott Agreement caused severe anticompetitive effects. For merchants, Amazon's marketplace is invaluable because it provides access to consumers. The agreement transformed Amazon's marketplace from a platform open to all merchants with bona fide Apple inventory into a platform open to Amazon and but a few arbitrarily selected Apple resellers able to use Amazon's intermediation services to connect with consumers. Indeed, the agreement deprived virtually all third-party merchants (all but seven) of an outlet to compete with other sellers for Amazon's intermediation services and transact with consumers seeking Apple goods on the platform.

57. For most third-party merchants excluded from the platform, Amazon was not just a channel to sell their Apple inventory, but the *only* channel. Amazon's third-party merchants

[50] *See* AGCM Decision at ¶ 426.

[51] *See supra*, Section I.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

report that they sell on Amazon because "they cannot turn to alternative marketplaces" to make sales.[52] Amazon CEO Jeff Bezos told Congress's antitrust subcommittee that "there are a lot of options" for sellers, but the subcommittee, having heard from scores of merchant and merchant associations, rejected that notion: "[t]his claim is inconsistent with [the] investigative record."[53] The reality is that merchants "who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon."[54]

58. Without meaningful alternative distribution channels, many Amazon resellers excluded by virtue of the Unlawful Boycott Agreement were forced to sit on inventory as it became stale and devalued. All excluded retailers (including Authorized Resellers) were deprived of a viable distribution outlet for Apple products and access to consumers. In denying numerous merchants access to intermediation services offered by Amazon to connect them to consumers, and the lack of opportunities to become merchants on other platforms, there was reduced competition for these merchants' services, as well as the goods sold by them.

59. Moreover, the Unlawful Boycott Agreement, by limiting the number of merchants on the Amazon Marketplace, denied potential new merchants a viable opportunity to enter the market and compete for Apple product transactions, including transactions involving tablets.

**2. The Unlawful Boycott Agreement had anticompetitive effects on the consumer side of the market.**

60. For consumers, the severe reduction in third-party Apple resellers on Amazon's Marketplace limited competition between merchants to transact with consumers desiring these products, resulting in supracompetitive prices. As a platform operator that also sells through its own platform, Amazon has (at least) two ways to increase consumer prices in response to reduced competition. It can charge consumers greater or additional transaction fees for use of the

---

[52] House Report at 257.

[53] House Report at 258.

[54] House Report at 258.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

platform. Alternatively, it can increase prices on goods it sells over the platform. Here, Amazon pulled the second pricing lever.

61. Specifically, before the Unlawful Boycott Agreement, active competition from a large population of resellers constrained the prices at which Apple products were offered through Amazon's buy box. The Unlawful Boycott Agreement eliminated this competitive constraint. Amazon became the dominant seller and, in that capacity, was no longer subject to the same downward pricing pressure from competing resellers. Internally, Amazon employees discussed the deterioration in price competitiveness on the platform resulting from the loss of third-party merchants.[55]

62. Available data for iPad transactions illustrate the price effects from the decline in competition in the market.[56] A comparison of iPad prices to Samsung Galaxy tablet prices on Amazon reveals a sharp divergence coinciding with the Unlawful Boycott Agreement. Samsung tablets are iPads' closest competitor on Amazon, sold in large volume by both Amazon and third-party sellers. But unlike iPads, Samsung tablets were never subject to any reseller restriction. If factors other than the Unlawful Boycott Agreement (rising costs, changing consumer demand, broader market trends) were responsible for the prices consumers paid for iPads, Samsung tablets would have moved in a similar direction. They did not.

[55] AGCM Decision at ¶ 108.

[56] The figures and analysis here are based on publicly available data from Keepa, a service that tracks historical pricing, seller, and product data for items listed on Amazon.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

63. Before the Unlawful Boycott Agreement, iPad and Samsung tablet prices on Amazon followed a broadly similar trend, with Samsung tablets averaging $274 less than iPads. Public data from Keepa indicates that, after the agreement, iPad prices diverged sharply upward while Samsung prices did not. The gap between the two widened from $274 to $563, an increase of $289. This is shown below:




64. This difference is not fully explained by differences in product characteristics. To isolate the Unlawful Boycott Agreement's effects, Plaintiffs use a difference-in-differences regression that measures how the gap between iPad and Samsung tablet prices changed after the agreement relative to the pre-Agreement period. This regression controls for screen size, storage capacity, time since release, camera quality, and RAM, to ensure the comparison reflects the agreement rather than shifts in the mix of products sold. Across six specifications[57], the models with the most comprehensive product controls estimate a price increase of approximately $40 to $109 per iPad.

[57] These six specifications progressively add controls for product characteristics; the simplest controls for time since release, whereas the most comprehensive controls for time since release, camera characteristics, storage, screen size, and RAM, and explains over 90% of the variation in the data. All produce statistically significant results.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

65. These findings comport with the AGCM's own pricing analysis of the Italian market, which estimated a 5-10 percent reduction in the rate of discounting following the agreement.[58]

66. The Unlawful Boycott Agreement also deprived consumers of market alternatives. The multitude of Apple resellers on Amazon's marketplace before the Unlawful Boycott Agreement offered consumers differentiated product offerings. To compete against hundreds of other merchants on Amazon Marketplace, Apple resellers had to distinguish their listings, not just in terms of price, but also with respect to shipping, returns, promotions, service, and other terms of sale. This differentiation in offers gave consumers meaningful choice and the ability to find a retailer best suited to their individual needs as to any given purchase. The Unlawful Boycott Agreement, by eliminating virtually all Apple resellers from Amazon Marketplace, curtailed these options.

**3. The Unlawful Boycott Agreement reduced output.**

67. Without the Unlawful Boycott Agreement's restrictions on third-party sellers, output would have been higher because those sellers would have continued competing alongside Amazon to sell Apple products. The restrictions in the Unlawful Boycott Agreement eliminating third-party sellers were not necessary for Amazon to be an authorized reseller of Apple products; Apple regularly enters authorized reseller agreements without these anticompetitive terms. Accordingly, any output generated by Amazon's status as an authorized reseller would have existed in a competitive market operating without the Unlawful Boycott Agreement. Output also fell in part because, as noted above, excluded third-party merchants were unable to find alternative distribution channels for their Apple inventory. Output fell further because the challenged restraints resulted in supracompetitive prices. Basic economics predicts that higher prices result in fewer units being sold. In a market free from the anticompetitive restraints, lower prices would have sparked additional demand and, thus, higher output.

[58] *See* AGCM Decision at Tables 17-20.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**G. Both Amazon and Apple Secured Anticompetitive Benefits from the Unlawful Boycott Agreement.**

68. Amazon and Apple agreed to foreclose competition from third-party merchants because it benefited their bottom lines. Eliminating these competitors furthered Amazon's and Apple's ambitions to increase their online retail sales of Apple products above what they would have been absent the agreement, while maintaining high prices and thus high margins on each unit sold. The products were sold at prices higher than prior to the Unlawful Boycott Agreement and, pursuant to basic supply and demand principles when competitor merchants are eliminated, higher than those prices would have been in the but-for world absent the agreement.

69. For Amazon, the benefits secured by the Unlawful Boycott Agreement are not difficult to discern. Amazon received from Apple a consistent supply of Apple's most popular products at a significant discount—potentially exceeding 10 percent—with these discounts being tied directly to Amazon's exclusion of third-party merchants that sold Apple products.[59] And by eliminating virtually all third-party Apple resellers from Amazon Marketplace, Amazon secured for itself (as a retailer) the lion's share of Apple product sales on its platform, whereas before its sales of Apple products were marginal at best.[60] Overall, and as the AGCM found, the anticompetitive effects of Unlawful Boycott achieved Amazon's goal to obtain excess profits on the sale of these goods. Indeed, the AGCM explained that Amazon's profits on the sale of Apple products "increase[d] significantly" as the result of the Unlawful Boycott Agreement.[61] Amazon's increased share of the Apple products sold on its marketplace and its high margins were linked directly to, and flowed from, the agreement's anticompetitive effects—*i.e.*, the exclusion of third-party merchants that sold Apple products.

70. Apple likewise benefited from the elimination of third-party competitors on Amazon's Marketplace. In essential respects, the Unlawful Boycott Agreement continues Apple's strategy of scarcity, through which Apple stabilizes its own retail prices and market

---

[59] AGCM Decision at ¶¶ 426-27.

[60] *See supra*, Section I.

[61] AGCM Decision at ¶ 421.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

share (for its own stores) by restricting third-party Apple resellers' access to the market. Higher consumer prices on Amazon Marketplace benefit Apple by relieving the downward pressure on the prices Apple can charge through its direct distribution channel. That is because consumers who see high prices on the Apple Store will no longer see the same products offered at a discount on the marketplace. This helps to protect Apple's high margins. The key difference between the Unlawful Boycott Agreement and Apple's prior efforts to sustain high retail prices for its products, and what made it so effective, is that Apple implemented the Unlawful Boycott Agreement with the help of a colluding horizontal competitor with massive market power in the markets affected by the restraints. *See infra* Sections V.C & D.

### H. There is No Procompetitive Justification for the Unlawful Boycott Agreement, Much Less One Unattainable Through Less Restrictive Means.

71. Publicly and in response to the AGCM investigation, Apple and Amazon have asserted that their Unlawful Boycott Agreement was justified to combat the sale of counterfeit Apple products on Amazon's marketplace. It was not. That assertion is purely pretextual. The Unlawful Boycott Agreement's restriction on resellers was not qualitative—the parties did not make any effort to identify and exclude known counterfeiters. Rather, the limitation was "purely quantitative." Apple set a number, and Amazon accepted it.[62] In addition, Apple does not enter Authorized Reseller Agreements with counterfeiters; yet, the Unlawful Boycott Agreement excluded *Authorized Resellers* of Apple products from selling on Amazon's platform, even when their inventory was *directly sourced from Apple* (*i.e.*, not sourced through a wholesaler). Finally, if the purpose of the agreement was to eliminate counterfeiters, it would have included refurbished products, which can just as readily be counterfeited.

72. The Unlawful Boycott Agreement was also not needed to combat the sale of counterfeit Apple products on Amazon. When the Unlawful Boycott Agreement was entered, there were already tools available to snuff out counterfeiting.[63] Most prominently, Amazon had a Brand Registry tool that effectively eliminated counterfeiting on brands enrolled in the program.

---

[62] AGCM Decision at ¶ 456.

[63] *See supra*, Section IV.B.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

According to Amazon, "brands report 99% fewer suspected infringements on average than before the launch of the Brand Registry program."[64] Amazon told the AGCM that, prior to the Unlawful Boycott Agreement, it had "tried for many years to convince Apple to join the brand registry program, but it was only after the [agreement] was signed that Apple agreed to join."[65] Apple thus did not enter the Unlawful Boycott Agreement to address counterfeiting; if it had really wanted to, it would have availed itself of existing platform tools that, for years, it had refused to implement.

## V. RELEVANT MARKETS

### A. Within the Online Marketplaces Market, There is a Relevant Antitrust Submarket for Tablet Transactions.

73. As used in this Complaint, an Online Marketplace is a two-sided online platform that enables consumers to buy retail goods, including tablets, listed by multiple sellers. It does so by mediating transactions between willing buyers and sellers. Amazon is the dominant Online Marketplace, but there are others, the largest being eBay and Walmart Market.

74. Because Online Marketplaces mediate between buyers and sellers, they operate what economists call a "two-sided platform." *Ohio v. Am. Express Co. ("Amex")*, 138 S. Ct. 2274, 2280 (2018). "As the name implies, a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." *Id.*

75. Online Marketplaces are also a particular type of two-sided platform known as a "transaction" platform. "These platforms facilitate a single, simultaneous transaction between participants." *Id.* at 2286. A transaction platform cannot transact a sale with a participant on one side of the platform without simultaneously transacting the sale with a participant on the other side. For Online Marketplaces, the platform intermediates transactions between willing buyers and sellers of consumer goods. On Amazon Marketplace, for example, a sale does not occur until a consumer agrees to purchase a product from a merchant listing on the platform.

---

[64] AGCM Decision at ¶ 121.

[65] AGCM Decision at ¶ 440.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

76. As a transaction platform, Amazon can levy a price or commission on the transaction itself. However, it also competes with rival marketplaces such as eBay, Walmart, and others on the range, quality, speed of delivery, retail prices, and membership offer that is available on its platform. To control these aspects of its offer to consumers, Amazon sets commissions, sets fulfillment prices, sets Prime prices, decides whether to offer its own version of a product, and if so at what price (it also sets restrictions on third-party seller prices). These are the multiple levers that it uses to ensure that its offer is an attractive one that wins and maintains its market share.

77. One feature of two-sided platforms, including Online Marketplaces, is that they exhibit "indirect network effects." *See id.* at 2281. Indirect network effects arise when the value of the platform on one side depends on how many participants the platform sustains on the other. For example, an Online Marketplace with few sellers is less attractive to buyers as compared to a marketplace with a greater number of sellers. Likewise, an Online Marketplace with few buyers will have difficulty attracting sellers. By contrast, when a two-sided transaction platform secures a critical mass of participants on one side, it becomes far more attractive to participants on the other. This can create a feedback loop of demand fueling participation on both sides of the platform and, as a consequence, a greater number of platform transactions.

78. Plaintiffs explain in this Section V.A why Online Marketplaces constitute a relevant antitrust market. Within that market, there is a relevant antitrust submarket for tablet transactions on Online Marketplaces. Tablets bear certain smartphone features, but they function as a complement rather than a substitute for smartphones. Indeed, when the first tablet was launched in 2010—Apple's iPad—it was marketed as a "third category of device," distinct from smartphones and laptops.[66]

79. Tablets provide users with different functionality than smartphones—they are generally less mobile than smartphones as a result of being larger, and they typically lack cellular

---

[66] *See* William Gallagher, *Apple got tablets right, and created a whole new market with the iPad 12 years ago today*, APPLEINSIDER (Jan. 27, 2022), https://appleinsider.com/articles/19/01/27/apple-got-tablets-right-and-created-a-whole-new-market-with-the-ipad (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

connectivity. A study in the United Kingdom, for example, showed that 83% of consumers with an iPhone also had a tablet. If a smartphone were a substitute for a tablet, the consumer wouldn't also need a tablet (and vice-versa). There is no reason to think U.S. smartphone users differ in their view of the substitutability between smartphones and tablets.

80. In terms of the product itself, screen size is a primary differentiator. With a larger screen (up to 17 inches) the tablet is less mobile than a smartphone. It can be ported, but not stowed in a pocket. And because of the larger screen, certain apps are available only for tablets, which provide a more immersive viewing experience. Tablets also do not always have cellular connectivity, and thus the ability to use text and phone on the move. Tablets also offer the user more productivity and office-related functionality, particularly with a keyboard add-on allowing the user to edit documents. There is a relevant antitrust submarket for tablet transactions on Online Marketplaces.

**1. Transactions on Non-Platform Online Stores Are Not Reasonable Substitutes.**

81. There are several online retailers that do not function as marketplaces, including retailers that sell tablets and/or Apple products. Examples include the online Apple Store and, until recently, Best Buy.[67] These online stores are not in the same relevant market as Online Marketplaces, irrespective of whether tablets are also sold on them.

82. Unlike marketplaces, these non-platform online retailers do not host a range of sellers or mediate *transactions* between third and first-party sellers, and buyers. Because they are not transaction platforms, these online retailers do not offer intermediation services to third party sellers, connect sellers with buyers via a simultaneous transaction, or compete with Online Marketplaces for transactions. The Supreme Court has recognized that while there may be differing competitive dynamics on each of the two sides of a transaction platform, for market

[67] For the majority of the class period, Best Buy did not operate a marketplace. It launched one in August 2025. *See* Best Buy, *Best Buy Launches Digital Marketplace, More Than Doubling Number of Products Available Online* (Aug. 19, 2025), https://corporate.bestbuy.com/2025/marketplace/ (last visited Oct. 8, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

definition purposes, a transaction platform should not be broken out into "two separate markets." *Id.* at 2283. "In two-sided transaction markets, only one market should be defined." *Id.* at 2287.

83. Single-merchant online retailers are also not *functionally* interchangeable with Online Marketplaces. Because Online Marketplaces are two-sided platforms, competition and substitution on both the buy and sell sides of the platform must be considered.

84. On the merchant (seller) side of the transaction platform, single-merchant stores are not a remotely reasonable substitute. That is, a third-party seller on Amazon Marketplace cannot, for example, sell iPhones within Apple's online store. The intermediation services offered by Online Marketplaces to sellers, which connect sellers to buyers of their goods and enable them to compete with one another for transactions with willing consumers, are not services offered by single-merchant stores. Moreover, most third-party merchants are small operations without the resources and notoriety needed to establish a successful online store.

85. This much was reported by the Online Merchants Guild, which advised Congress that "[m]any Amazon sellers use websites such as Shopify to try to establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[68] As the House subcommittee on antitrust concluded, it is "clear that Amazon has monopoly power over most third-party sellers and many of its suppliers" and sellers are "forced on Amazon because that is where the buyers are."[69] It is estimated that "37% of Amazon's third-party sellers, representing over 85,000 sellers, rely on Amazon as their sole source of income."[70] The fact that some large Amazon consumer electronics third-party merchants (*e.g.*, Dell) also maintain their own retail website also indicates that Online Consumer Electronics Marketplaces and non-marketplace online retail are complements, not substitutes.

86. Even if there were fluid substitution on the merchant side of the Online Marketplace, this alone would not support including non-marketplace online stores within the

---

[68] House Report at 258.

[69] House Report at 257.

[70] House Report at 249.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

same relevant antitrust market. That would require that consumers also substitute away from marketplaces. As the Supreme Court has cautioned, "focusing on one dimension of competition tends to distort the competition that actually exists among two-sided platforms." *Amex*, 138 S. Ct. at 2287 (internal quotation marks, ellipses, and bracket marks omitted).

87. On the consumer side of the platform, competition with non-platform online stores is asymmetrical. That is, Online Marketplaces impose substantial constraints on non-platform online stores, given the relative ease of purchasing goods from a marketplace instead of a single-merchant store. But substitution in the other direction—from marketplaces to non-platform online stores—is more limited. There are at least three reasons for this.

88. *First*, there are substantial numbers of consumers who purchase from marketplaces because, by definition, marketplaces offer an incomparable array of products and the ability to "one stop shop." Non-marketplace (single-merchant) online stores cannot offer the same functionality and convenience, and thus a significant number of consumers will purchase products on marketplaces—including tablets—even when they can be obtained at lower prices from single-merchant outlets. Analogously, it is not uncommon for consumers to buy goods at a supermarket (e.g., baked goods) that could be obtained at a lower cost from an individual retailer (a bakery). The convenience of obtaining many goods together, and the option to browse and make impromptu additional purchases, often permits a marketplace to impose a price premium. This indicates that while a price increase by a single-merchant outlet may drive significant customer defections to a competing marketplace, a price increase by a marketplace is unlikely to cause significant defections to single-merchant outlets, whether that be the Apple Store or other single-merchant retailers.

89. This is particularly true for *online* marketplaces. By purchasing from a single online marketplace, consumers need only manage one account with order, payment, and shipping details. Searching out products across online retailers, evaluating their trustworthiness and managing multiple purchaser accounts, is time consuming and burdensome. Many consumers prefer the ease of a one-stop Online Marketplace, even if it means they pay a little more for the goods they purchase. For example, among Amazon Prime members, 92% look forward to being


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

able to order all goods through one retailer and 93% are more likely to buy from Amazon Prime than directly from a retailer's online site.[71] Moreover, 66% of shoppers start their search directly on Amazon, and this increases to 74% for consumers that want to purchase a specific product.[72] This means few consumers would even see the lower prices that might exist elsewhere, and of those that do, many will only see those on eBay or another marketplace (which would themselves be operated by the same hypothetical monopolist under the hypothetical monopolist test—*see infra*, Section V.A.3, for application on this test).

90. The marketplaces model enables platforms like Amazon and eBay to allow hundreds of thousands of third-party sellers the opportunity to offer products that extend the choice available to consumers, creating a so-called "endless aisle." Moreover, these platforms do so at little risk by choosing in many cases not to purchase these products wholesale and resell them, as a reseller would, but instead to list them and charge a commission on the sales that are actually made. In contrast, non-marketplaces such as online resellers operate as buying departments to select the firms and products that they choose to take the risk of stocking and the quantity to stock in each period. They then purchase wholesale from those suppliers that are selected. This selectivity ensures compatibility with the branding of the store, prevents duplication within the existing range of products offered, and reduces the risk of stocking unsuccessful products. However, the inevitable cost of taking on more of this risk (and not leaving it all with third-party sellers), is a narrower range and stock of products.[73]

91. By having a multiplicity of competing third-party sellers, marketplaces (analogous to the selection and convenience offered by the massive Uber/Lyft driver network versus individual taxicabs or taxi fleets), also allow more efficient dynamic pricing that reflects

---

[71] Patrick Munden, *The Amazon Prime Effect - setting a new standard for customer loyalty*, Wunderman Thompson, https://www.readkong.com/page/the-amazon-prime-effect-setting-a-new-standard-for-2249341 (last visited Sept. 28, 2026).

[72] Catie Grasso, *The 2019 Amazon Consumer Behavior Report*, Feedvisor (March 19, 2019), https://feedvisor.com/resources/amazon-trends/the-2019-amazon-consumer-behavior-report/ (hereinafter, "2019 Amazon Consumer Behavior Report") (last visited Sept. 28, 2026).

[73] *How to Sell to John Lewis*, Enterprise Nation (July 27, 2017), https://www.enterprisenation.com/learn-something/how-to-sell-to-john-lewis/ (last visited Sept. 28, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

fluctuating consumer demand and scarcity of supply. This attracts a larger supply of products and allocates them in a way that reduces “out-of-stock” events (which in turn encourages consumers to rely upon and turn first to a marketplace).

92. *Second*, to the extent that marketplaces are neutral in their treatment of different third-party sellers, they are incentivized to adopt more effective and reliable customer review mechanisms that consumers value. For instance, a single-seller site will have no incentive to permit customer feedback that criticizes the firm selling the product. In contrast, Amazon, eBay, and others have pioneered the ability to post photos, star ratings, and all sorts of feedback about the product, the fulfillment, and the seller, which enriches the consumers’ understanding of the product and help them choose a product, without worrying about whether they choose the sellers’ own product. For example, shoppers report that the most important reason for choosing Amazon is that it is a one-stop shop where they can see almost every possible purchase option in one place, and they can narrow down the list of choices by scrolling through the product reviews.[74]

93. *Third*, because they offer an array of everyday products, marketplaces can (and do) establish programs that incentivize platform loyalty. Amazon’s Prime subscription service is but one example.[75] Through its Prime program, Amazon offers consumers free shipping and other incentives for a monthly (or annual) fee. For Prime enrollees, the program fees are a sunk cost. To recoup them, enrollees must continue to make Prime purchases and gain the associated benefits justifying the outlay of enrollment fees (e.g., free shipping).

94. In theory, if consumers perceive that prices on Amazon’s platform are rising, for example, and hence the value of a Prime subscription is falling, then these consumers have the option to not renew their subscription. However, where these consumers purchase regularly from Amazon (acting rationally on the basis of having prepaid the delivery charges), this will reduce

[74] *Why Consumers Pick Amazon, and What You Can Do About It*, adlucent, https://web.archive.org/web/20240815015306/https://www.adlucent.com/resources/blog/why-consumers-pick-amazon-and-what-you-can-do-about-it/ (last visited Sept. 28, 2026).

[75] Walmart’s answer to Amazon Prime is Walmart Plus, a similarly structured program.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

their *per order* delivery charge, since the fixed payment will be spread over a larger number of deliveries. These regular purchases are in turn likely to increase the perceived value that these consumers place on subscribing to Amazon Prime, making the demand for subscriptions to some degree self-fulfilling. This suggests that once signed up, consumers will tend to renew. Survey evidence is consistent with this.[76]

95. An industry analyst estimates that 82% of U.S. households have a Prime account.[77] Emphasizing the way Prime "lock[s] [most] consumers into the Amazon ecosystem," the Congressional antitrust subcommittee concluded that "Amazon also enjoys significant power over online consumers."[78] In sum, substitution on the consumer side of the Online Marketplaces market with single-merchant online stores that sell consumer goods, including tablets, is neither fluid nor symmetrical.

**2. Brick-and-Mortar Stores Are Not Reasonable Substitutes**

96. Conventional brick-and-mortar outlets—including brick-and-mortar two-sided marketplaces[79]—are also not a reasonable substitute for Online Marketplaces. Again, substitutability (or lack thereof) on both the buyer and seller sides of the platform must be evaluated.

---

[76] 2019 Amazon Consumer Behavior Report, p. 8: "Nearly half (45%) of current Prime members make a purchase on Amazon at least once a week. All of this data demonstrates that Prime members are frequent online buyers, habitually taking advantage of the benefits offered to them through the program"; p. 9: "For those consumers who are Prime members, an overwhelming number of respondents (95%) are likely to keep their Amazon Prime membership"; p. 9: "Of the respondents who answered they are Prime members, a majority (83%) cited free two-day shipping as the most compelling benefit of Prime membership."

[77] April Berthene, *82% of US households have an Amazon Prime membership*, Digital Commerce 360 (July 11, 2019), https://www.digitalcommerce360.com/2019/07/11/82-of-us-households-have-a-amazon-prime-membership/#:~:text=Factoring%20in%20the%20households%20number,have%20multiple%20individual%20Prime%20accounts (last visited Sept. 28, 2026).

[78] House Report at 259.

[79] Consignment stores and auction houses could be considered two-sided marketplaces because, like Online Marketplaces, they provide transaction services matching willing buyers and sellers. However, these sellers are not reasonable substitutes for online consumer marketplaces because, among other considerations, it is not their core business to offer new products for immediate purchase at a set price. *See In re Ebay Seller Antitrust Litig.*, 2010 U.S. Dist. LEXIS 19480, at *19-28 (N.D. Cal. Mar. 4, 2010).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

97. From the perspective of consumers, Online Marketplaces facilitate seamless shopping across a wide range of goods or services (including for tablets), all from home or on the move using internet-enabled devices. In contrast to brick-and-mortar retail, consumers are also not constrained by their physical location when using an Online Marketplace. Instead, they can readily purchase goods from retailers across the country offering nationwide shipping. Online shopping also minimizes the risk that a product is out of stock because online retailers typically store larger volumes of goods and stock a more diverse inventory than physical stores.

98. In addition to avoiding the need to travel to a physical location, Online Marketplaces such as Amazon's offer other significant conveniences when compared to conventional brick-and-mortar retailers. Once a consumer creates an account with an online retail platform, the platform stores a host of details such as payment information, delivery addresses, and past purchases. This information allows consumers to order or re-order items with minimal transaction costs, sometimes with a single click.

99. For sellers, brick-and-mortar retail is likewise not reasonably interchangeable with Online Marketplaces. Establishing a physical store requires substantial start-up costs and overhead (rent, maintenance, staffing, insurance, property taxes, etc.). A physical store is likewise constrained by its location and unable to reach consumers in different locales. Online Marketplaces, by contrast, offer sellers access to a large and geographically diverse population of consumers, without the costs of maintaining a physical retail presence. That some brick-and-mortar retailers also sell through Online Marketplaces shows that these outlets are complements, not substitutes.

100. In sum, and considering both the buy and sell sides, there is little cross-elasticity of demand between Online Marketplaces and brick-and-mortar stores.

**3. The Proposed Market Would Pass a SSNIP Test**

101. A common method to determine the relevant market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, typically 5%. A hypothetical monopolist in the market for Online Marketplaces could profitably impose a SSNIP—that is, sustain a significant price



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

increase without losing volume sufficient to make the price increase unprofitable. That is similarly true for a monopolist in the submarket for tablet transactions on Online Marketplaces.

102. A hypothetical monopolist of a platform presumptively may raise prices on either side of the platform (based, for example, on which side has fewer attractive options to substitute to). A platform operator is also not restricted to simply increasing the commission it charges. It can also impose a deterioration in its offer in other ways, for instance, by increasing its own first-party retail prices.

103. Focusing first on the seller side of Online Marketplaces market, an analysis of Amazon itself shows that a hypothetical monopolist's pricing power and ability to sustain a SSNIP is not constrained by any substitution occurring away from the seller side of the transaction platform. Amazon has regularly increased the fees it charges its third-party merchants to sell on Amazon Marketplace. Although Amazon's referral fee have remained virtually unchanged, between 2015 and 2020, Amazon increased the average fees it charges sellers from 19% to 30%, meaning that Amazon increased sellers' own costs by 58%.[80] And yet the number of third-party merchants on its platform has tripled over the same period.[81] In addition, Amazon's "Most Favored Nation" or "MFN" policies prevent the third-party merchants from increasing their prices on the platform relative to other online outlets, thus minimizing the likelihood of substitution occurring on the consumer side of the transaction platform.[82] This effectively means that Amazon's high fees are reflected in online consumer prices, whether they purchase on Amazon Marketplace or on another site where third-party sellers sell the same

---

[80] House Report at 274.

[81] Compare *Amazon Tops Six Million Third-Party Sellers*, Marketplace Pulse (Mar. 24, 2021), https://www.marketplacepulse.com/articles/amazon-reaches-six-million-third-party-sellers (last visited Sept. 28, 2026), with Sarah Perez, *Amazon's Third-Party Sellers Ship Record-Breaking 2 Billion Items In 2014, But Merchant Numbers Stay Flat*, TechCrunch (Jan. 5, 2015), https://techcrunch.com/2015/01/05/amazon-third-party-sellers-2014/ (last visited Sept. 28, 2026).

[82] House Report at 295; *see also Frame-Wilson v. Amazon.com, Inc.*, 2022 U.S. Dist. LEXIS 44109 (W.D. Wash. Mar. 11, 2022).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

goods.[83] And in fact, Amazon Marketplace doubled its share of the U.S. online retail revenue to 56.7% in 2021 from 28.1% in 2014.[84] Amazon Prime membership also tripled in the same period and has continued to grow rapidly.[85]

104. In further support of the conclusion that there is a separate market for transactions on Online Marketplaces, focusing on the submarket for tablet transactions, one could also perform a SSNIP test on the consumer side of the transaction platform. Such a SSNIP (or an SSNDQ[86]) would show that if the hypothetical monopolist decided to increase its revenues by imposing a price increase, the alleged market would pass the hypothetical monopolist test. The evidence described in Sections V.A.1 and V.A.2, *supra*, suggests a high degree of consumer inelasticity, for reasons which are likely to be true whether the SSNIP is applied at the overarching level of a monopolist in Online Marketplaces, or whether the hypothetical monopolist is understood only to control the relevant product submarkets.

105. Other evidence of shoppers' insensitivity to prices on Online Marketplaces indicates that it is a separate market. Prices on Amazon Marketplace vary according to the day of the week (by approximately 4% on average).[87] Such increases would not be profitable for sellers if Amazon consumers would choose on high-price days to buy elsewhere, or even just to delay purchases until lower priced days of the week. The fact that they are profitable suggests that consumers do not do so and hence there is a degree of insensitivity to the price they pay.

---

[83] *See, e.g.*, Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium (July 18, 2019, https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2 ("If Amazon either charged us less or stopped restricting our ability to sell on other platforms for less, we could pass on those savings to consumers.") (last visited Sept. 28, 2026).

[84] *Amazon's Share of US eCommerce Sales Hits All-Time High of 56.7% in 2021*, PYMNTS (March 14, 2022), https://www.pymnts.com/news/retail/2022/amazons-share-of-us-ecommerce-sales-hits-all-time-high-of-56-7-in-2021/ (last visited Sept. 28, 2026).

[85] Brian Dean, *Amazon Prime User and Revenue Statistics (2026)*, BACKLINKO (Sept. 10, 2026), https://backlinko.com/amazon-prime-users (last visited Sept. 28, 2026).

[86] SSNDQ means "small but significant non-transitory decrease in quality." The SSNDQ test has been suggested for use in markets with rapid technological change.

[87] Farnoosh Torabi, *Cheapest days to shop online*, Money Watch (Nov. 7, 2011), https://www.cbsnews.com/news/cheapest-days-to-shop-online-07-11-2011/ (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

106. Given the relative price insensitivity displayed by users on Amazon Marketplace itself, where the search costs in discovering all offers for a specific product are relatively low, it can be reasonably inferred that price insensitivity would be greater when buyers are comparing offers between Online Marketplaces, and greater still when comparing offers between the marketplaces and alternatives outside the proposed market. This high sensitivity to small search costs, and low sensitivity to price differences, suggests that a price increase by a hypothetical monopolist in the Online Marketplace market, including the submarket for tablets sold on Online Marketplaces, would not result in significant substitution by consumers to sales channels outside of this market. That is further supported by the evidence that Amazon alone was able to sustain iPad prices at elevated levels relative to a competitive benchmark (Samsung tablets) after the Unlawful Boycott Agreement went into effect.

**B. The Relevant Geographic Market is the U.S.**

107. Most Online Marketplaces, including Amazon, operate their marketplaces within national boundaries.[88] Product availability, prices, and shipping options vary between U.S. online marketplaces and marketplaces specific to other countries.[89] Thus, there is a relevant U.S. geographic market for Online Marketplaces. For similar reasons related to product availability, prices, and shipping options for the purchase of these goods from U.S. storefronts versus those abroad, the alternative market discussed in section V.D, *infra*, should also be confined to the U.S.

**C. Amazon Has Substantial Market Power in the Market for U.S. Online Marketplaces, including the Submarket for Tablet Transactions.**

108. Amazon operates the largest Online Marketplace in the United States. As observed by the House subcommittee on antitrust, Amazon is "the dominant online

[88] Autorita' Garante della Concorrenza e del Mercato, Dec. 9, 2021 report, ¶¶ 85-90 https://www.agcm.it/dotcmsdoc/allegati-news/A528_chiusura%20istruttoria.pdf (last visited Sept. 28, 2026).

[89] *See* Adam Rozsa, *Buying From Amazon in a Different Country? Do they ship internationally?,* Wise (July 25, 2022), https://wise.com/us/blog/buying-from-amazon-in-a-different-country (last visited Sept. 28, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

marketplace."[90] An industry analyst suggests that Amazon controls as much as 90% of all U.S. online marketplace sales and that eBay and Walmart, Amazon's closest rival marketplaces, have only peripheral shares.[91] Amazon also accounted for about 82% of the total consumer electronics sales in the U.S. in 2021 and it is fair to infer that its share among marketplaces is even higher.[92]

109. Amazon's market power is durable and reinforced by several features of the Online Marketplace market.

110. To begin with, barriers to entry are high. As Amazon itself recognizes, building an Online Marketplace "'require[s] significant incremental investments in brand development, inventory, and marketing/customer acquisition.'"[93] Prominent economists have observed that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[94] The combination of these attributes "tend[s] to generate concentrated markets, or market structures containing few firms," and, "[w]ith the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[95]

111. Indirect network effects pose a particularly substantial hurdle to entrants, cementing Amazon's market power. Building a successful marketplace requires securing a critical mass of consumers and merchants on the platform. Strong participation on both sides of the platform generates a feedback loop of demand, with consumers attracted to the large roster of merchants, and merchants attracted to the large population of consumers. A startup marketplace with a limited customer base will be unable to attract merchants, and likewise a marketplace with

---

[90] House Report at 255.

[91] *Supra*, *Amazon Marketplace is 25% of US E-commerce*.

[92] 2019 Jumpshot report, *Retail Winners, Losers and Amazon*, at 21.

[93] House Report at 260 (quoting internal Amazon analysis).

[94] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf (last visited Sept. 28. 2026).

[95] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

few merchants will be of limited interest to consumers. It is thus extremely difficult for new entrants to unseat an incumbent marketplace with a critical mass of buyers and sellers.

112. Having obtained this critical mass, Amazon benefits from substantial indirect network effects. It has hundreds of millions of regular customers, including over 200 million Amazon Prime users, and 1.65 million third-party merchants.[96]

113. Competing for these consumers and merchants is particularly difficult because of the high costs of switching to an alternative online marketplace. Through regular use, consumers grow accustomed to Amazon's platform and all its quirks, while building out an order history from which they can make repeat purchases. An industry analyst estimates that 82% of U.S. households have an Amazon Prime account.[97] "American households that have Prime memberships are effectively locked into Amazon for their online shopping," as they think they are recouping the sunk costs of their Prime membership when they make additional purchases on Amazon's Marketplace.[98] "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[99]

114. On the other side of the platform, Amazon has amassed at least 1.65 million merchants. By way of comparison, reports indicate that Walmart has just 54,000 sellers on its marketplace.[100] There is platform stickiness for merchants as well. Merchants build up reviews and ratings that instill consumer confidence. These reviews and ratings are not readily ported to

---

[96] Michael Levin & Josh Lowitz, *US Amazon Prime Membership Estimate - No Bad News is Good News?*, CIRP - Amazon Report (July 14, 2026), https://cirpamazon.substack.com/p/us-amazon-prime-membership-estimate (last visited Sept. 28, 2026); Ben Donovan, *Amazon New Seller Numbers Hit Decade Low in 2025*, Marketplace Pulse (Apr. 24, 2026), https://www.marketplacepulse.com/articles/amazon-seller-registrations-hit-decade-low-in-2025 (last visited Sept. 28, 2026); House Report at 249.

[97] Fareeha Ali, *Amazon's Prime Day sales will jump 46%*, Digital Commerce 360 (July 10, 2019). https://www.digitalcommerce360.com/2019/07/10/amazon-prime-day-predicitions/ (last visited Sept. 28, 2026).

[98] House Report at 256.

[99] House Report at 260.

[100] House Report at 87.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

another platform.[101] A merchant transitioning to a new platform thus needs to start from scratch to build up a profile.

115. Even if a merchant were to prefer a rival platform—for example because of lower transaction fees—Amazon makes it difficult for that merchant to transition its consumers to the rival. Amazon does this in part by generally forbidding "sellers from contacting their customers."[102] More prominently, Amazon MFN policies prevent merchants from using price differentials to steer consumers to platforms that compete with Amazon.[103] They likewise inhibit competing marketplaces from using lower transaction fees to attract consumers to their platforms, because lower fees can (by virtue of the MFN) never be passed through to benefit consumers in the form of lower prices.

116. Direct evidence of Amazon's market power also abounds. Retailers report that, with Amazon dominating the market they "don't have a choice but to sell through Amazon."[104] For example, one Amazon merchant informed Congress: "Were we to be suspended from selling on Amazon.com, it would probably take 3 – 6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."[105] "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explained the co-director of the Institute for Local Self-Reliance.[106]

---

[101] House Report at 42.

[102] House Report at 258.

[103] House Report at 295.

[104] House Report at 87, 270.

[105] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, MEDIUM (July 18, 2019), https://medium.com/swlh/amazon-needs-acompetitor-and-walmart-aint-it-5997977b77b2 (last visited Sept. 28, 2026).

[106] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, House Judiciary Committee (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf (last visited Sept. 28, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

117. Amazon's market power is further evident in its ability to raise prices above the competitive level. Through listing and other fees, Amazon secures for itself 27% of every dollar spent on Amazon.com.[107] Rival marketplaces (like eBay) impose significantly lower fees, and yet Amazon continues to grow its market share. Amazon's own analyses reflect its substantial pricing power. One report concluded that "seller attrition" from a 2018 price increase was "[n]othing significant."[108]

118. And this is to say nothing of Amazon's Unlawful Boycott Agreement, which as set forth above, led to a substantial price increase on Apple iPads that consumers absorbed. That is direct evidence of Amazon's market power. Plaintiffs explain *supra* in Section IV.F.2 and elsewhere that after Unlawful Boycott Agreement eliminated virtually all Apple resellers (down to 7 resellers total), Amazon was able to and actually did maintain increased buy box prices for Apple products. As discussed above, a comparison of Samsung and iPad sales on Amazon indicates that the Unlawful Boycott Agreement increased iPad prices by approximately $40 to $109 per iPad. This comports with the AGCM's own pricing analysis of the Italian market, which estimated a 5-10% reduction in the rate of discounting following the agreement.[109]

**D. In the Alternative, There Is a Relevant One-Sided Antitrust Submarket for The Sale of Tablets on Online Marketplaces, and Amazon Has Market Power in That Submarket.**

119. As set forth above, the Unlawful Boycott Agreement restrains trade on Amazon's Marketplace—a two-sided transaction platform, which is the proper way to define and analyze the market under the Supreme Court's *Amex* decision. That is equally true when one focuses on transactions for tablets.

120. Yet, even if one ignores *Amex* when analyzing these restraints on the Amazon platform and focuses only on a one-sided market for tablet sales, it is necessary to limit the

---

[107] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html (last visited Sept. 28, 2026).

[108] House Report at 274.

[109] *See* AGCM Decision at Tables 17-20.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

relevant submarkets to sale of tablets on online transaction platforms,[110] as distinct from tablets sold through other retail distribution channels such as direct online retail or brick-and-mortar stores. This is because these other distribution channels do not exert sufficient competitive pressure on sales of tablets through transaction platforms to discipline prices on these platforms. The reasoning for this conclusion mirrors that discussed in paragraphs 84 to 93 and 96 to 97, which explained why consumer substitution between online marketplaces and other channels is asymmetrical and only on the margins, and thus would not be sufficient to prevent a hypothetical monopolist from increasing prices on transaction platforms.

121. *First,* as the SSNIP test discussed in paragraphs 101-103 shows, price increases on Amazon Marketplace are not sufficiently constrained by substitution occurring away from the consumer side of the platform. Sales of goods (including tablets) outside of the transaction-platform channel, such as on single-merchant online stores, do not impose a meaningful constraint on prices of sales on transaction platforms such as Amazon's. While there may be some marginal competition, there is not enough to place these single-merchant online stores in the same market for antitrust purposes.

122. *Second*, sales of these goods at conventional brick-and-mortar outlets are not a reasonable substitute for sales on online marketplaces. That is so for the same reasons explained in paragraphs 96 through 98, which discussed the substitutability (or lack thereof) on the buyer side of online marketplaces with brick-and-mortar stores. As shown, there is little cross-elasticity of demand between sales on online marketplaces and brick-and-mortar stores. *See also supra* ¶¶ 104-106 (discussing SSNIP test applied to consumer side of the platform).

123. In sum, even if one were to analyze the market here as one-sided, assess competition solely from the consumer perspective, and ignore the competitive impact of Defendants' conduct on the merchant side of the platform, the relevant submarkets would still be limited to sales of tablets on two-sided transaction platforms.

---

[110] In this Complaint, Plaintiffs have referred to online transaction platforms as Online Marketplaces.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

124. Moreover, Amazon possesses market power in these alternative one-sided market and submarkets.

125. To begin with, a high share of sales in this market flows through Amazon's platform. Within the broader category of all consumer electronics sales online, Amazon Marketplace controls some 82%. Amazon Marketplace also controls as much as 90% of all online marketplace sales across all products. These remarkable indicators of Amazon's market power in the broader markets of online retail marketplace sales and online electronics sales provide strong indications of Amazon's substantial market share in tablet sales through marketplaces. That is particularly so because it can be reasonably inferred that tablet sales are a substantial portion of the consumer electronics category.

126. Amazon Marketplace's market share is the relevant basis to assess Amazon's market share in the antitrust submarkets for the sale of tablets on Online Marketplaces (transaction platforms). Amazon is not only the dominant retailer on its platform, it also controls the competition its platform provides in the relevant markets because it controls third-party sellers' access to its platform. As previously explained, Amazon is the gatekeeper to online retail sales and most third-party sellers are unable to compete if they are denied access to its platform.

127. But even if the transactions between consumers and third-party sellers that go through the Amazon platform were not counted towards Amazon's market share, Amazon would still possess considerable market power via the *threat of its entry or expansion* as a first-party seller of tablets sold on transaction platforms. Amazon has reported that approximately 40% of all sales on its platform are sales of products for which Amazon (and not any third-party) is the merchant and retailer.[111] And even prior to the Unlawful Boycott Agreement, Amazon was already a significant seller of other brands of tablets. For example, as discussed above, prior to the agreement Amazon controlled some 82% of all consumer electronics sales online (including those not taking place on Marketplaces, which are excluded from a proper market definition). Moreover, Amazon had repeatedly demonstrated that it possesses both the means and

---

[111] *See* Jeff Bezos Shareholder Letter (March 5, 2021) at 1.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

willingness to expand its dominance as a first-party seller on its own platform. Indeed, Amazon possesses a number of advantages that allow it to quickly expand its first-party dominance. These include its access to proprietary consumer data collected from its platform, its access to (and ability to change) its own search ranking algorithm to benefit its own product offers, and its vertical integration with its own logistics service, Fulfilled by Amazon. Perhaps the simplest and best evidence that Amazon posed a significant threat of expanding its dominance on its own platform was the fact that it actually did. Before the Unlawful Boycott Agreement, it was only a marginal seller of iPads. After January 2019, Amazon became, overnight, the dominant seller of this product on Amazon Marketplace, cementing its dominance in the online platform sales of tablets.

128. Finally, it is helpful to note how the restraint operated in this market. Typical of challenged restraints in markets for the sale of goods to consumers, the Unlawful Boycott Agreement restrained the market by substantially reducing the number of sellers of tablets in the market. That caused anticompetitive effects in the market as discussed in Section IV.F, and it harmed members of the class by causing them to pay higher prices than they would have paid absent the Unlawful Boycott Agreement.

## VI. INTERSTATE TRADE AND COMMERCE

129. The conduct of Defendants as alleged in this Complaint was within the flow of, and substantially affected, interstate commerce. The relevant market (and the alternative relevant markets) and sale of goods by Amazon, Apple, and third-party merchants operates across, and without regard to, state lines.

## VII. CLASS ALLEGATIONS

130. Plaintiffs bring this proposed class action for damages and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

131. Plaintiffs bring this action on Plaintiffs' own behalf and on behalf of the following class:



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

> All persons and entities who, as residents of the United States and during the period of May 7, 2020, to the date of class notice, purchased any new iPad from the Buy Box on Amazon.com.[112]

132. For purposes of the Class Definition, the "Buy Box is the box on the top righthand side of product listings on Amazon.com." The Buy Box contains "Add to Cart" and "Buy Now" buttons that customers can use to make a purchase.

133. Excluded from the proposed Class are the Defendants; Defendants' affiliates and subsidiaries; Defendants' current or former employees, officers, directors, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members; and all governmental entities.

134. **Numerosity:** The exact number of the members of the proposed Class is unknown and is not available to Plaintiffs at this time, but upon information and belief, the class will consist of many thousands of members such that individual joinder in this case is impracticable.

135. **Commonality:** Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed Class. These include, but are not limited to:

a. Whether Amazon and Apple entered an agreement to restrict the number of third-party merchants capable of offering Apple Products on Amazon.com;

b. Whether there is an antitrust market for Online Marketplaces and/or antitrust submarkets for tablet transactions on Online Marketplaces (or any of the alternative submarkets);

c. Whether Defendants have unlawfully restrained trade in any relevant antitrust market;

---

[112] The Class Period begins May 7, 2020, which is four years preceding the date Plaintiffs Furdek and Ryan first asserted these claims in *Floyd v. Amazon.com, Inc.*, No. 2:22-cv-01599-KKE (W.D. Wash.). The *Floyd* action was dismissed on grounds unrelated to the merits of Plaintiffs' claims, and Plaintiffs are currently appealing the dismissal. The limitations period for the claims asserted in this action were tolled by Plaintiffs' claims in the *Floyd* matter, and while tolling should persist through the appeal, Plaintiffs file this protective complaint to guard against any conceivable time bar.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

d. Whether consumers have been harmed by Defendants, including by having paid higher prices for Apple Products than they would have absent Defendants' challenged conduct;

e. Whether Plaintiffs and members of the proposed Class are entitled to declaratory or injunctive relief to halt Defendants' unlawful practices, and to their attorneys' fees, costs, and expenses; and

f. Whether Plaintiffs and members of the proposed Class are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, or otherwise.

136. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed Class. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all of the other members of the proposed Class.

137. **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. Plaintiffs have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and theirinterests do not conflict with the interests of the proposed class members they seek to represent. Class counsel have invested substantial resources developing these claims, and are qualified and best positioned to lead the representation of the proposed Class.

138. **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there may be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Plaintiffs' proposed Class would prevent these undesirable outcomes.

139. **Injunctive and declaratory relief:** By way of the conduct described in this Complaint, Defendants have acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

140. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VIII. ANTITRUST INJURY AND STANDING

141. During the Class Period, Plaintiffs and members of the proposed Class directly made purchases on Amazon Marketplace. Because of the anticompetitive conduct alleged in this Complaint, Plaintiffs and Class members were forced to pay more for those purchases than they would have if Amazon and Apple had not entered the Unlawful Boycott Agreement to eliminate third-party Apple resellers from the Amazon Marketplace. Defendants therefore have caused Plaintiffs and Class members to suffer overcharge damages.

142. In other words, the Unlawful Boycott Agreement eliminated competitive resellers of Apple products, and but-for that agreement and its anticompetitive effects, those eliminated sellers would have caused prices for these products, including the Apple iPads purchased by Plaintiffs, to be lower. That is, Plaintiffs were damaged because in a competitive market absent the anticompetitive effects of the challenged restraint they would have paid less for their purchases.

143. Because Defendants continue to exclude third-party Apple resellers from Amazon Marketplace, Plaintiffs and Class members are reasonably likely to incur future overcharges when they make additional purchases on Amazon Marketplace. Plaintiffs and Class members have standing as direct purchasers of goods sold on Amazon Marketplace at an inflated price. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

caused by Defendants' violations of federal antitrust laws, including the Unlawful Boycott Agreement. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## IX. CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE – CONCERTED REFUSAL TO DEAL / GROUP BOYCOTT

144. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

145. Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

146. As discussed *supra*, at all relevant times prior to and during the conspiracy alleged, Apple and Amazon have been and are horizontal competitors that compete with one another and other online retailers of tablets, including, but not limited to, third-party merchants selling these types of Apple products on Amazon Marketplace. Amazon competes while wearing its hat as an online retailer selling consumer electronics, and Amazon also exerts its outsized influence in the market while wearing a different hat, running the largest online retail marketplace and the most visited ecommerce website in the world. Amazon's dual "hats" have been critical to Amazon in carrying out its role in the unlawful conspiracy discussed in this Complaint.

147. Beginning at least as early as October 31, 2018, Apple and Amazon (together, Defendants), by and through their officers, directors, employees, agents or other representatives, entered into a continuing horizontal contract, agreement, and conspiracy in restraint of trade to effectuate a concerted refusal to deal/group boycott (the Unlawful Boycott Agreement), which went into effect on January 1, 2019.

148. In exchange for certain consideration discussed in more detail *supra*, pursuant to Defendants' Unlawful Boycott Agreement, Apple proposed, and Amazon agreed, to refuse to permit all but a few Amazon third-party merchants to sell new Apple products on Amazon's



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

marketplace. All other third-party merchants were prohibited from listing Apple products on the marketplace. The limitations pursuant to this boycott were purely quantitative and not done for any qualitative reasons. Defendants limited the number of Apple resellers on Amazon's marketplace in each country, including the United States. This arbitrary and purely quantitative threshold had the effect of excluding even Authorized Resellers of Apple products. Before the Unlawful Boycott Agreement, more than 600 Apple resellers were operating on Amazon Marketplace. But the Unlawful Boycott Agreement had the effect of eliminating more than 98 percent (593 of at least 600) of third-party Apple product resellers.

149. Amazon and Apple agreed to this concerted refusal to deal/group boycott of numerous Apple resellers because it benefited their bottom lines. By eliminating third-party merchants that sold Apple products, Amazon and Apple—as online merchants in horizontal competition—were able to reallocate online sales of Apple products between themselves, maintaining high prices and thus high margins on each unit sold.

150. The Unlawful Boycott Agreement harmed competition in the relevant antitrust submarket alleged, the U.S. submarket for tablet transactions on Online Marketplaces, where Amazon has substantial market power. *See supra*, Part V.A.[113] As discussed in Section IV.F, the Unlawful Boycott Agreement increased consumers' prices and decreased consumer choice. The substantial reduction in third-party Apple resellers on Amazon Marketplace eliminated competitive pricing pressure, and deprived consumers of market alternatives. The Unlawful Boycott Agreement also had anticompetitive effects on the merchant side of Amazon's platform. For most third-party Apple resellers excluded from the platform, Amazon was not just a channel to sell their Apple inventory, but the *only* channel. Indeed, many online merchants report that they sell on Amazon because "they cannot turn to alternative marketplaces" to make sales.[114] The Unlawful Boycott Agreement denied most third-party merchants of Apple products the economic relationships they need to compete in the market, because they were deprived of a

---

[113] In the alternative, the Unlawful Boycott Agreement harmed competition in the relevant alternative antitrust submarkets, as discussed in Section V.D., *supra*.

[114] House Report at 257.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

viable distribution outlet for Apple products and denied critical access to Amazon Marketplace's massive customer base. The Unlawful Boycott Agreement, by restricting the number of merchants on the Amazon Marketplace, also denied potential merchants a viable opportunity to enter the market and compete for sales.

151. Defendants' purported competitive justifications for the Unlawful Boycott Agreement are pretextual or not viable. The Unlawful Boycott Agreement was not reasonably needed or designed to eliminate counterfeits. Nor do the antitrust laws justify the elimination of hundreds of competing Apple resellers from Amazon Marketplace to secure for Amazon (in its retail capacity) a steady supply of Apple goods.[115] Defendants Apple and Amazon have thus engaged in an unlawful concerted refusal to deal/group boycott.

152. A detailed analysis of Defendants' agreement will demonstrate that this arrangement violates the rule of reason and is illegal.

153. As consumers who purchased new Apple products on the Amazon Marketplace after implementation of the Unlawful Boycott Agreement, Plaintiffs and the Class have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent, including by paying higher prices for those products than they would have paid absent Defendants' unlawful agreement.

154. The amount of damages suffered by Plaintiffs and members of the Class has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

155. Plaintiffs and members of the Class are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

---

[115] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977) (The antitrust laws . . . were enacted for the protection of competition not competitors.") (quotation omitted); *PLS.Com, LLC. v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) ("[S]paring consumers the need to patronize competing firms is not a procompetitive justification for a group boycott.").



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A. That the Court certify this case as a class action and that it appoint Plaintiffs as class representative and their counsel as class counsel;

B. That the Court award Plaintiffs and the proposed Class all appropriate relief, to include, but not be limited to, injunctive relief requiring that Amazon and Apple cease the abusive, unlawful, and anticompetitive practices described herein; declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity.

C. That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

D. That the Court award Plaintiffs and the proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

DATED October 9, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By *_/s/ Steve W. Berman_*
Steve W. Berman (WSBA No. 12536)
By *_/s/ Ted Wojcik_*
Ted Wojcik (WSBA No. 55553)
1301 Second Avenue Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tedw@hbsslaw.com

Ben M. Harrington (*pro hac vice forthcoming*)
Benjamin J. Siegel (*pro hac vice forthcoming*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com